Donald H. Cram (State Bar Number 160004)
don.cram@stinson.com
STINSON LLP
595 Market Street
Suite 2600
San Francisco, California 94105
Telephone:    415.398.3344
Facsimile:    415.956.0439

*COUNSEL FOR LIVE OAK BANKING COMPANY*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>MOUNT ACADIA SENIOR PROPERTIES LLC, a California limited liability company,<br><br>Debtor. | Case No. 25-05308-JBM 11<br><br>Chapter: 11<br><br>Hon. J. Barrett Marum<br><br>**OBJECTION OF LIVE OAK BANKING COMPANY TO MOTION OF DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO ENGAGE DAVID KIEFFER OF STAPLETON GROUP AS CHIEF RESTRUCTURING OFFICER OF THE DEBTOR**<br><br>Date:          December 30, 2025<br>Time:         11:00 a.m. (Pacific Standard Time)<br>Dept:          Hon. J. Barrett Marum |

STINSON LLP
230 West McCarty Street
Jefferson City, Missouri 65101
573.636.6263

LIVE OAK BANKING COMPANY'S OBJECTION TO DEBTOR'S MOTION TO APPOINT CHIEF RESTRUCTURING OFFICER

CORE/3505040.0023/235939305.5

Live Oak Banking Company ("Live Oak") submits this Objection to the *Motion Of Debtor And Debtor-In-Possession For Entry Of An Order Authorizing Debtor To Engage David Kieffer Of Stapleton Group As Chief Restructuring Officer Of The Debtor* [Docket No. 5] (the "CRO Motion") filed by Mount Acadia Senior Properties LLC ("Debtor"). This Objection is supported by the Declaration of Christopher J. Harayda, ("Harayda Dec."), the Declaration of Caroline Gann ("Gann Dec."), the record, and/or any evidence that may be presented and that the Court may consider at the hearing on the CRO Motion.

## INTRODUCTION

Live Oak and the Debtor agree as to at least one item in the CRO Motion: the Debtor's principal should not retain control of the Debtor's operations or finances or construction of Debtor's senior care living facility in San Diego (the "Facility"), on which the Debtor has blown through $28 million in loan proceeds but failed to finish construction. Indeed, that was among the reasons why Live Oak sought and had Mr. Kieffer of the Stapleton Group appointed as receiver in a proceeding before the Superior Court for the State of California in San Diego County (the "San Diego County Court").

Should this proceeding continue, Live Oak would support the appointment of Mr. Kieffer to oversee the Facility and manage the Debtor if the roles and responsibilities are detailed and DIP funding is secured. At present, however, the CRO Motion should not be granted. First, Live Oak will seek to dismiss this proceeding as soon as possible, as the filing is unauthorized. In the alternative, since Mr. Kieffer, as the Receiver, has already secured the Facility and begun plans to move forward with the completion of construction of the Facility with Live Oak's support, he should be allowed to retain the Facility and not turn it over as estate property.

Further, the relief sought in the CRO Motion is premature. There is no emergency requiring the appointment of the CRO at this time. Finally, the CRO Motion provides no detail as to how the Debtor will fund this case, let alone how it will fund the fees and expenses of the CRO at the outset, given that the Debtor admits it has no cash on hand. In fact, despite requests from Live Oak, the Debtor has failed to produce a budget as to how it would complete the Facility.

As a result, the hearing on the CRO Motion should be continued until the more pressing issues are resolved, including whether this case should be dismissed.

## FACTUAL BACKGROUND

**A.    $28 Million Loan to Debtor, the Debtor's Default under the Loan, and Failure to Complete Construction of the Facility.**

Live Oak is, by far, Debtor's largest secured creditor and has provided the lion's share of funding for the ground-up development of Debtor's senior care living facility located in San Diego County, California (the "Facility"). (Gann. Dec. ¶3.) Debtor executed a loan agreement in the principal amount of $28,000,000.00 (the "Loan") in favor of Live Oak and Locust Point Senior Housing Debt Fund II, L.P. ("Locust Point," together with Live Oak, the "Lenders")—on May 27, 2022 (the "Loan Agreement"). (Gann Dec. ¶¶ 3-4, Ex. A.) Contemporaneous with the Loan Agreement, Debtor also executed two Notes—one in favor of Live Oak and one in favor of Locust—both of which memorialize the principal amount each Lender loaned to Borrowers. (Gann Dec. ¶¶ 7-9, Ex. B-C.) Live Oak is the senior lender and administrative agent under the loan facility and has authority to act as an agent for the Lenders. (Gann Dec. ¶ 5, Ex. A.)

To secure Debtor's performance and repayment of the Loan, Debtor executed a Construction Deed of Trust, amended from time to time, in favor of Live Oak in its capacity as administrative agent (the "Construction Deed of Trust").[1] (Gann Dec. ¶ 11.) The Construction Deed of Trust (and each of the amendments), were recorded with the San Diego County Recorder on May 27, 2022, as Document Number 2022-0227696, May 2, 2023, as Document Number 2023-0114163, and October 31, 2023, as Document Number 2023-0300440. (Gann Dec. ¶¶ 11-12, Ex. E.) The Construction Deed of Trust grants Live Oak, as administrative agent for the benefit of the Lenders, a blanket security interest in and to, and a lien upon, all Debtor's rights, title, and interest in the Facility and Debtor's personal property. (Gann Dec. ¶ 13.) Live Oak perfected its security interest in Debtor's personal property by filing a UCC-1 Financing Statement with the California Secretary of State on May 31, 2022, as File Number U220199144235. (Gann Dec. ¶ 16, Ex. F.)

---

[1] The Loan Agreement, the Notes, the Construction Deed of Trust, and all other ancillary loan documents are referred to as the "Loan Documents."

The Debtor has been in default under the Loan Documents since at least October 2024, and has run out of funding to complete the construction of the Facility. It is undisputed that Debtor's defaults under the loan documents include failure to (i) make the required monthly payments, which includes its failure to make monthly payments since August 2025; (ii) complete construction of the Facility by the agreed upon completion date of February 27, 2024; and (iii) pay subcontractors, resulting in several mechanics' liens encumbering the Real Property Collateral, and several mechanics' lien lawsuits. (Gann Dec. ¶¶ 21-26.) Live Oak's remedies under the Construction Deed of Trust include, among other things, the appointment of a receiver. (Gann Dec., Ex. E.).

The Debtor has also been in ongoing litigation with its former general contractor, Premium West LLC ("Premium West"), who alleges serious mismanagement of the Facility project by the Debtor. Premium West detailed these issues in its complaint against the Debtor, which is also pending before the San Diego County Court, Case No. 25CU031247C. (Gann Dec., Ex. L.)

On top of the ongoing defaults, as conceded by the Debtor's principal, it ran out of funding in October 2025 and has already blown through the additional funds it received from its principal. (DeWald Dec. ¶¶ 35, 46.)

By November 2025, the threat of irreparable harm to the Facility was imminent, as it sat incomplete, unsecured, and unfunded, and with San Diego's rainy season on the horizon. As the parties agree, Live Oak has no obligation to fund any more than it already has under the Loan Documents and is, and was, unwilling to provide any more funding without the appointment of a receiver. (See DeWald Dec. ¶ 49.)

For a period of time in November 2025, the parties negotiated terms for a possible consensual receivership. (Gann Dec. ¶ 28; DeWald Dec. ¶¶ 48-51.) During those negotiations, Live Oak, through its counsel, shared with the Debtor and its counsel a proposed form of order appointing the receiver, which included many of the same terms as the current Receiver Order (defined below) does today. (Harayda Dec. ¶ 8.)

Negotiations between the parties eventually came to a stalemate, as the Debtor gave Live Oak an ultimatum that it would only agree to the appointment of a receiver if Live Oak agreed to

give the Debtor a blank check to complete the Facility, despite the Debtor's failure to do so on time with the $28 million already loaned to it. The Debtor failed to even provide a budget for completion of the Facility. Of course, Live Oak could not agree to provide such open-ended funding, particularly given the Debtor's track record.

To protect its rights and its collateral, Live Oak commenced an action in the San Diego County Court against the Debtor and other borrowers and guarantors captioned *Live Oak Banking Company v. Mount Acadia Senior Properties LLC, et al.*, Case Number 25CU060842C (the "State Court Case"). After the parties reached an impasse on agreeable terms for a consensual receivership, Live Oak sought the appointment of Mr. Kieffer as receiver. (Gann Dec. ¶ 32.)

**B.  State Court Case and Appointment of Receiver**

A hearing on Live Oak's Application for Receiver before Judge Bowman, the judge presiding over the State Court Case, was initially held on November 20 and November 25, 2025. (Harayda Dec. ¶¶ 4-6.) An evidentiary hearing was then held before Judge Bowman on December 8 and 9, 2025. (Harayda. Dec. ¶ 6.)

After hearing from both sides, Judge Bowman entered an Order appointing David Kieffer as receiver over the real and personal property assets of Debtor and its non-debtor affiliate, Mount Acadia Senior Operations, on December 9, 2025 (the "Receivership Order"). (DeWald Dec., Ex. A.) Identical to the terms provided in the proposed form of receivership order that was exchanged between the parties during negotiations, the Receivership Order provides, among other things:

> The Receiver shall have all the powers of the directors, officers, and managers of the Mount Acadia Parties, and the authorities of any directors, officers, or managers in existence immediately prior to entry of this Order are hereby suspended.

(*Id.*) Under the Receivership Order, the authority of the Debtor's directors, officer, and managers to act on behalf of the Debtor was suspended and vested in the Receiver. Such authority necessarily includes the authority to file for bankruptcy relief. At no point during the evidentiary hearing, closing statements, or at any other time, has Debtor or Debtor's counsel objected to the above terms of the Receivership Order. (Harayda Dec. ¶ 8.)

Given the nature of the Debtor's business and the incomplete construction of the Facility, the Receiver's charge is namely to remedy the construction, safety and security issues and to oversee the completion of the Facility. (*See* DeWald Dec., Ex. A.) For the past two weeks, the Receiver has worked to do exactly that in coordination with Live Oak. The Receiver and Live Oak are working together to create a budget and awaiting responses from subcontractors on confirmation of prior figures for work. (Gann Dec. ¶ 37.) Live Oak has also provided funds to pay the delinquent general liability insurance for the Debtor with a six-month extension and property tax for the Facility and is processing payment for the urgently needed roof repairs done at the Facility. (*Id*. at ¶ 38.) Contrary to the Debtor's mistruths, Live Oak and the Receiver have not, however, had any discussions regarding the sale process or immediate sale of the Facility. (*Id*. at ¶ 39-40.) Rather, the focus for Live Oak has been on immediate needs of the Facility, including security and safety, and finalizing a budget with the Receiver with the expectation that full site construction work will resume mid-January. (*Id*. at ¶ 40.) In sum, Live Oak and the Receiver have been busy addressing the numerous financial and structural issues created by the Debtor's mismanagement of the Facility and the Debtor's finances. (*Id*. at ¶¶ 37-40)

### C. The Debtor Has No Cash Collateral and Has Not Sought Approval of a DIP Loan.

Despite the Receivership Order, on December 23, 2025, the Debtor filed the petition to commence this proceeding and counsel for the Debtor provided courtesy notice of this proceeding to counsel for Live Oak on the afternoon of December 24, 2025.

The Debtor admits that it has no cash collateral. (DeWald Dec. ¶¶ 35, 46; CRO Motion at p. 8.) The Debtor has also not sought approval of a debtor-in-possession loan. (*See* Docket generally.) Although the Debtor alludes to a potential facility that would require a priming lien, the Debtor has once again provided no term sheet or commitment letter for such alleged loan. (*See* Dewald Dec., ¶ 39(p).) Live Oak has requested a term sheet or a commitment for this proposed financing but has never been provided one. The Debtor's principal also told the San Diego County Court over a month ago that the funding from Mr. Renzi was imminent, but such funding never

materialized. (*See* Harayda Dec. ¶ 5.) At present, the Debtor has no cash and no access to further funding.

**OBJECTION**

**I.     The Filing of The Petition to Commence This Case Was Unauthorized**

Live Oak intends to promptly file a motion to dismiss this case. The Receivership Order entered on December 9, 2025, explicitly provides that the Receiver was vested with all powers of the manager of the Debtor and that Mr. DeWald and any other managers' powers were suspended. (Receivership Order, p.2 (Dewald, Ex. A).) Thus, the Receiver has the sole authority to file a petition to commence a bankruptcy proceeding for the debtor and not the Debtor's manager, directors, or officers.

The Debtor is a California limited liability company with a sole manager, which has been identified as Mount Acadia Ventures LLC. (DeWald Dec. ¶ 1.) As will be detailed in Live Oak's forthcoming Motion to Dismiss, the San Diego County Court has the authority to determine who can authorize the commencement of a bankruptcy proceeding on behalf of a California-formed entity. See *In re Licores*, No. SA 13-10578-MW, 2013 WL 6834609 (C.D. Cal. Dec. 20, 2013). The San Diego Court revoked the manager of the Debtor's corporate powers and vested them in Mr. Kieffer on December 9, 2025, when it entered the Receivership Order. As a result, the manager of the Debtor had no authority to file the petition to commence this proceeding, which is dated as of December 23, 2025 (Docket No. 1), and this case must be dismissed.

**II.    The Relief Sought is Premature and No Emergency is Identified**

Nowhere in the CRO Motion or declarations filed in support does the Debtor identify any exigent circumstances or emergency that require the immediate appointment of Mr. Kieffer. Rather, they allege that funding is needed and that a fiduciary should be in charge. (Dewald Dec., p.3).

Live Oak agrees that a fiduciary should be in charge of the Facility. That is why Live Oak sought and had Mr. Kieffer appointed as Receiver and why Live Oak has been working with Mr. Kieffer on a budget to fund further work on the Facility. Mr. Kieffer in his time as Receiver has

already secured the Facility. Thus, if the Debtor's concern is to have a fiduciary in charge of the Facility and for funding of construction, then the Receivership has already accomplished this goal.

Even more, the added duties placed on Mr. Kieffer as CRO in the bankruptcy case would significantly detract from the Receiver's primary goal of completing the construction of the Facility and would add a significant layer of administrative expenses. This includes supervision and administration of the Debtor's case, preparation of the Schedules and Statement of Financial Affairs, reporting to the UST, preparing pleadings, litigating claims, and formulating and confirming a Plan. If the Debtor cannot prepare its own schedules, that also raises a number of concerns.

Numerous threshold issues must be resolved before Mr. Kieffer is appointed as CRO. First, Live Oak will seek to dismiss this proceeding as the manager of the Debtor had no authority to commence this case in light of the Receivership Order, vesting all corporate authority in the Receiver. Second, in the alternative, if the commencement case was authorized, the Receiver nonetheless should remain in possession of the Facility. Such outcome would serve the same purpose as appointment of a CRO.

Third, the Debtor currently has no operational funds, and it is unclear whether the Debtor's long-claimed new funding will materialize and be approved by this Court, such that the fees and expenses of the CRO be funded. This question cannot currently be answered. The details of Mr. Kieffer's role as CRO is also unclear, as the Debtors provided only a generic form of engagement letter. No proposed order detailing Mr. Kieffer's retention has been filed as of the date of this Objection. In fact, the CRO Motion does not even state that Mr. Kieffer is willing to accept the proposed CRO role, as his declaration is one that was filed in support of the Receivership application in the State Court Case.

### III. The Debtor Is Currently Unable to Fund the Fees and Expenses of the CRO

If this proceeding is to continue, the Debtor acknowledges that a debtor-in-possession loan will be required. The Debtor has not, however, provided any evidence that it can obtain such funding, including failing to include a copy of the alleged "commitment" it has received. Of course, the Debtor has not yet sought approval of debtor-in-possession funding either. Given

that this case was filed only days ago, immediately before a holiday, and that no term sheet or details whatsoever were submitted regarding the alleged DIP loan, Live Oak and all other parties in interest have no ability to evaluate the terms of any purported DIP loan or whether such loan can satisfy the requirements under 11 U.S.C. § 364. If this case proceeds, it is possible that Live Oak may agree to provide DIP finding.

The lack of funding to pay Mr. Kieffer's fees is illustrated by the requirement in the form of engagement letter submitted by the Debtor, which requires payment of a $75,000 retainer. (Dewald Dec., Ex. B). The Debtor does not have $75,000 to pay a retainer or any funds to pay the ongoing fees of Mr. Kieffer. While a CRO or trustee would be necessary here, the appointment is putting the cart before the horse at this point in the case. By contrast, as receiver, Mr. Kieffer has assurance of payment and was proceeding with his caretaking and construction tasks.

The Debtor's claim that an unfunded Debtor with a CRO is better than the receivership are patently false. Mr. DeWald's allegations that the Receivership is underfunded are unsupported and similarly incorrect. (*See* Gann Dec. ¶¶ 37-40.) Live Oak has already worked to establish a budget with the Receiver, paid certain essential delinquent amounts (insurance and property taxes), and anticipates construction restarting in a matter of a couple of weeks. (*Id*.) Moreover, the Receiver can seek additional funding if needed from other sources or could even commence a chapter 11 proceeding on behalf of the Debtor. (DeWald Dec., Ex. A.)

**IV.    Live Oak Agrees that Mr. Kieffer is Disinterested and Qualified to be CRO**

While the time for appointment of a CRO or other fiduciary has not arrived, Live Oak agrees that Mr. Kieffer is disinterested, as he serves only as a court-appointed receiver for the assets of the Debtor and its affiliate. Mr. Kieffer is also indisputably qualified to safeguard the Debtors' assets. This is precisely why the San Diego County Court approved his appointment as Receiver for the Debtor. In the event that a CRO is to be appointed, Mr. Keiffer is the best and logical choice.

**V.    Request For Judicial Notice.**

Live Oak requests that this Court take judicial notice of the docket and orders of the court in *Live Oak Banking Company v. Mount Acadia Senior Properties LLC, et al*., pending in the

San Diego County Court, Case Number 25CU060842C.  Federal Rule of Evidence 201(b) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

## **CONCLUSION**

In the event that this case is not dismissed and the Debtor is able to secure DIP funding, whether from Mr. Renzi, Live Oak, or otherwise, Live Oak agrees that the Debtor's principal should not be in control and that Mr. Kieffer should be appointed as a responsible fiduciary.  But the time for such appointment is not one week into a case that was filed without corporate authority.  Instead, the CRO's appointment should be continued or held in abeyance until the precedent issues are resolved, including whether this case was authorized to be commenced.

Dated:  December 30, 2025                                    STINSON LLP

By:  /s/ *Doland H. Cram III*
Donald H. Cram III (State Bar Number 160004)
don.cram@stinson.com
STINSON LLP
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone:    415.398.3344
Facsimile:     415.956.0439

-and-

C.J. Harayda (MN  0390333) (pro hac vice pending)
cj.harayda@stinson.com
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone:    612.335.1500

*Counsel for Live Oak Banking Company*